IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CONSERVATION COUNCIL FOR HAWAII, and AMERICAN BIRD CONSERVANCY, <br><br> Plaintiffs, <br><br> vs. <br><br> HAWAIIAN ELECTRIC COMPANY, INC., *et al.*, <br><br> Defendants. | Civil No. 24-00494 MWJS-WRP <br><br> ORDER DENYING DEFENDANT COUNTY OF MAUI'S MOTION TO EXCLUDE CAUSATION TESTIMONY OF HANNAH MOON, PH.D. AND JAY PENNIMAN, AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE TESTIMONIES OF JOHN W. CURRAN, PH.D. AND THOMAS R. GLESNE |

## INTRODUCTION

Plaintiffs Conservation Council for Hawai'i and American Bird Conservancy allege that Defendant County of Maui's streetlights unlawfully harm—or in the language of the Endangered Species Act, "take"—protected Hawaiian seabirds. They intend to introduce evidence that County streetlights cause this harm by distracting and attracting the seabirds, ultimately causing them to "fall out" of the sky. And they seek to establish this in part through the testimony of two experts: Dr. Hannah Moon and Jay Penniman.

The County argues, however, that the proffered expert opinions are untested, unsupported, and unreliable, and should therefore be excluded. And through the testimony of Dr. John W. Curran and Thomas R. Glesne, it seeks to offer its own expert

opinions in support of a different conclusion about which artificial light sources cause seabird take. Plaintiffs seek to exclude this expert testimony on competence, relevance, and reliability grounds.

On April 1, 2026, the court held a hearing at which Dr. Moon and Penniman testified about the bases for their expert opinions. Having considered that testimony and the arguments of counsel, the court concludes that it is clear that Plaintiffs' experts are qualified, and that their opinions are sufficiently reliable and relevant to clear the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). But the hearing also made clear that the scientific consensus on what causes seabird fallout is not *so* firmly established as to make the County's expert testimony irrelevant. The court will therefore DENY Defendant County of Maui's Motion to Exclude Expert Testimony of Hannah Moon, Ph.D. and Jay Penniman, and, except in one limited respect, DENY Plaintiffs' Motion to Exclude Expert Testimony of John W. Curran, Ph.D. and Thomas R. Glesne. All four experts will be permitted to testify at trial.

## BACKGROUND

Since long before human beings stepped foot in Hawai'i, native seabirds have called the islands home. As adults, these creatures traverse the Pacific Ocean, sometimes traveling thousands of miles in search of food. But when it comes time to nest and breed, certain species of seabirds prefer the steep terrain of Maui Nui—the

geographic area that comprises the four major islands of Maui, Moloka'i, Lāna'i, and Kaho'olawe, which together comprise Maui County.

In particular, Maui County offers critical breeding habitats for the three species of seabirds involved in this lawsuit.  First, the uplands of Maui and Lāna'i serve as the largest breeding colonies for the 'ua'u, or Hawaiian petrel (*Pterodroma sandwichensis*). Second, the high elevation 'ōhia forests of Maui Nui provide nesting grounds for the 'a'o, or Newell's shearwater (*Puffinus newelli*).  And third, the cliff faces and lava flows of Maui and Lāna'i are believed to host breeding colonies for 'akē'akē, or band-rumped storm-petrel (*Hydrobates castro*).  *See* Dkt. No. 1, at PageID.14-20.  All three of these birds are protected under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*; both the 'ua'u and 'akē'akē are listed as endangered, while the 'a'o is listed as threatened.  *Id.*

Today, of course, Maui County is also home to thousands of people.  And for the safety and benefit of those people, Defendants Hawaiian Electric Company, Inc. and Maui Electric Company, Ltd. operate streetlights on behalf of Defendant County of Maui.  But Plaintiffs allege that for the ESA-listed seabirds involved in this case, such streetlights pose "a major threat to [their] continued survival and recovery."  *Id.* at PageID.20.  That is because, according to Plaintiffs, 'ua'u, 'a'o, and 'akē'akē "use the moon and stars to navigate and are often distracted by artificial lights" while heading out to or returning from sea, and "will circle artificial lights until they fall to the ground from exhaustion or strike other human-made structures"—a phenomenon known as

"fallout."  *Id.* at PageID.21.  Once grounded, the birds generally struggle to get airborne again and thereby become vulnerable to injury or death due to predation, starvation, dehydration, or vehicle strikes.

The Endangered Species Act makes it unlawful for a person to "take" any ESA-listed species without a permit.  16 U.S.C. § 1538(a).  "Take" is defined in the statute as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19), and consistent with congressional intent in enacting the ESA, it is given the broadest possible construction.  *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 704-08 (1995).  Plaintiffs have brought this lawsuit alleging that Defendants' streetlights cause unauthorized take of ESA-listed seabirds without a permit.  They seek declaratory and injunctive relief for this alleged violation of the Endangered Species Act.  *See* Dkt. No. 1.

In support of their contention that Defendants' streetlights take endangered seabirds, Plaintiffs have retained two individuals as seabird experts:  Hannah Moon, Ph.D., who holds a doctorate in zoology from the University of Hawaiʻi at Mānoa, and Jay Penniman, a seabird biologist with over two decades of experience leading the Maui Nui Seabird Recovery Project (MNSRP), a joint program between the University of Hawaiʻi and Hawaiʻi Department of Land and Natural Resources.  If permitted to testify, both Dr. Moon and Penniman would offer their opinions, based on similar methodologies, that Maui County streetlights cause seabird fallout.

4

The County has retained experts of its own to defend against Plaintiffs'
allegations.  The first, John W. Curran, Ph.D., is an applied physicist who holds a
doctorate in physics from Drexel University and maintains a professional focus on
lighting technology.  Dr. Curran "undertook a . . . survey and review of the typical
categories, makes, model, types, and uses of artificial lights" in Maui County that
"constitute[] the relative brightness within the surrounding urban lightscape" in
support of the County's argument that no single light source, including a County
streetlight, can be isolated as the cause of fallout.  Dkt. No. 116, at PageID.2256 (cleaned
up).  The County's second expert, Thomas R. Glesne, is a physicist and systems
engineer with substantial experience as a lighting consultant.  Glesne would testify
about the minimal contribution of County streetlights to skyglow above Maui County.

Motions to exclude the testimony of these expert witnesses followed.  Plaintiffs
filed a motion to exclude the testimonies of Dr. Curran and Glesne.  Dkt. No. 104.  The
County opposed the motion, Dkt. No. 118, and Plaintiffs replied, Dkt. No. 120.  The
County also filed its own motion to exclude the causation testimony of Dr. Moon and
Penniman.  Dkt. No. 105.  Plaintiffs opposed the motion, Dkt. No. 115, and the County
replied, Dkt. No. 119.  Defendants Hawaiian Electric Company and Maui Electric
Company separately filed a statement noting that they did not take any position with
respect to the pending motions.  Dkt. No. 129.

5

After reviewing both motions, the court concluded that an evidentiary hearing was necessary to evaluate the testimony of Plaintiffs' experts, *see* Dkt. No. 126, while a hearing to evaluate the testimony of Defendant's experts was not necessary because Plaintiffs' motion to exclude turned principally on questions of relevance. Dkt. No. 128. On April 1, 2026, the court held an evidentiary hearing at which Dr. Moon and Penniman testified. Dkt. No. 137. At that hearing, the court admitted Plaintiffs' Exhibits 1-22 and 29, and Defendant's Exhibits 1-16, without objection. *Id.* After the examination of Dr. Moon and Penniman concluded, there was not enough time remaining for the parties to make any arguments, so the court permitted each party to file a brief not longer than ten pages by April 8, 2026. Both parties timely submitted these optional briefs. Dkt. Nos. 134, 136.

## DISCUSSION

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rule 702 provides that an expert opinion is admissible if: "(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and

6

methods to the facts of the case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citing Fed. R. Evid. 702).

The Ninth Circuit has instructed that "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588). The court's role in a deciding a Rule 702 issue is a "gatekeeping role," *Daubert*, 509 U.S. at 597, and its "inquiry into admissibility is a flexible one." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (cleaned up). In essence, the court's task is simply "to screen [out] . . . unreliable nonsense opinions;" it is not to decide "whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful" to the factfinder. *Id.* at 969-70.

The proponent of the expert testimony has the burden to establish its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592 n.10. Where the proponent satisfies this burden and demonstrates that "the proposed testimony meets the thresholds of relevance and reliability," he is "entitled" to have the factfinder evaluate its credibility. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

With these standards in mind, the court turns to the merits of the parties' motions.

**A.    Dr. Moon and Penniman Are Qualified as Experts**

Courts interpret Rule 702 to permit the admission of expert testimony so long as the expert is qualified and the testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589-91.  Rule 702 "contemplates a broad conception of expert qualifications," which may include "knowledge, skill, experience, training, or education." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (cleaned up).  "[T]he threshold to qualify as an expert is low," as "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness' testimony, not its admissibility." *Waterwatch of Oregon v. Winchester Water Control Dist.*, No. 20-cv-01927, 2025 WL 1067620 (D. Or. Feb. 20, 2025) (cleaned up).

Plaintiffs put forward two experts to testify about seabird fallout:  Hannah Moon, Ph.D. and Jay Penniman.  Dr. Moon earned her Ph.D. in Zoology from the University of Hawaiʻi at Mānoa in 2024.  Dkt. No. 115-2, at PageID.2068.  Her dissertation, entitled "The Physiology and Molecular Ecology of Vision in Hawaiian Seabirds," dealt in part with the threats posed to Hawaiian seabirds, including ʻuaʻu and ʻaʻo, by artificial light attraction. *Id.*; Dkt. No. 115-1, at PageID.2049-50.  Since graduating, for reasons beyond her control, Dr. Moon has not yet found full-time employment as a biologist.  Dkt. No. 115-1, at PageID.2050-51.

Nonetheless, Dr. Moon has roughly a decade of relevant fieldwork and work experience.  That includes six years as a graduate research assistant at the University of

Hawaiʻi, where she taught undergraduates in biology courses, originated lesson plans on "difficult Hawaiian conservation issues, such as the seabird and football [lighting] conflict on Kauaʻi," and "[a]pplied for and annually reported permits related to researching endangered and protected Hawaiian seabirds and waterbirds." Dkt. No 115-2, at PageID.2068. It also includes nearly a year-and-a-half as a biotechnician for the Kauaʻi Endangered Seabird Recovery Project (KESRP) monitoring the incidental take of Hawaiian seabirds resulting from "human activities associated with . . . outdoor lighting," where her duties included rescuing and salvaging wedge-tailed shearwaters and ʻaʻo. *Id.* Outside of Hawaiʻi, Dr. Moon has worked as a shorebird biotechnician for the U.S. Department of Interior in Cape Cod, Massachusetts. She currently serves as a member of various advisory groups focused on the effects of artificial lighting on seabirds, including the National Fish and Wildlife Foundation Light Pollution Advisory Group and the Illuminating Engineering Society Outdoor Nighttime Environments Committee. *Id.* at PageID.2071-72. Dr. Moon has also authored or co-authored several papers, some of which have been published in peer-reviewed journals.

Jay Penniman received his Bachelor of Science from Portland State University in 1977. He has spent the past four decades working a wildlife biologist, including in various supervisory roles for the Maui Nui Seabird Recovery Project (MNSRP) over the course of the last twenty years. Penniman has been a co-author on a number of peer-reviewed publications—including several devoted to seabird attraction to artificial

light, *see* Travis Longcore, et al., *Rapid assessment of lamp spectrum to quantify ecological effects of light at night*, 329 J. EXPERIMENTAL ZOOLOGY 511 (2018); Airam Rodriguez, et al., *Seabird Mortality Induced by Land-based Artificial Lights*, 31 CONSERVATION BIOLOGY 986 (2017)—and has given dozens of presentations about seabirds at scientific conferences. Dkt. No. 115-8, at PageID.2144-50. Since 2008, he has been the chairman of Save Our Seabirds Maui, in which capacity he "[c]oordinate[s] multi-agency and business support for public outreach and recovery of light distracted seabirds in Maui County" and "[o]versee[s] recovery and triage actions for recovered birds." *Id.* at PageID.2143. In that same time period, he has also served as a member of the Seabird Hui, a "[s]tatewide, multi-agency, recovery planning" program for ʻuaʻu, ʻaʻo, and ʻakēʻakē. *Id.* In these roles, Penniman has spent thousands of hours in the field directly observing seabird behavior, and hundreds of hours "observing and recovering seabirds, including ESA-listed seabirds, grounded by attraction to artificial light in Maui County." Dkt. No. 115, at PageID.2029; Dkt. No. 115-7, at PageID.2123-24. Penniman also testified at the April 1 hearing that he has personally observed and recovered Hawaiian seabirds circling artificial lights in connection with a fallout incident.

Despite the impressive credentials and extensive experience of both Dr. Moon and Penniman, the County objects to their qualifications as insufficient to satisfy Rule 702. In its briefing, the County refers to them as "experts" using scare-quotes, attacks Penniman as "claim[ing] to be a 'wildlife biologist'" without "any academic credentials

10

as a biologist, animal behavioralist, or in any field of ornithology," and criticizes

Dr. Moon for "complet[ing] her on-line Ph.D. dissertation on seabirds" less than two

years ago and "only [having] worked as a grocery store delivery driver, and as an

alcohol salesperson since finishing school."  Dkt. No. 105-1, at PageID.1900 & nn.2-3.

These challenges are patently without merit.  Experts are qualified to testify if

they possess "sufficient specialized knowledge to assist the [factfinder] in deciding the

particular issues in the case."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)

(cleaned up).  And because Rule 702 "contemplates a *broad conception* of expert

qualifications," only a "*minimal foundation* of knowledge, skill, and experience" is

required.  *Hangarter*, 373 F.3d at 1015-16 (cleaned up) (original emphasis).

Plaintiffs' experts easily clear this bar, and the County's efforts to resist this

conclusion are unavailing.  Although the County asserts that Penniman lacks "academic

credentials" in wildlife biology, that characterization is on shaky ground given the

number of academic publications Penniman has to his name.  And in any event, "[t]he

Federal Rules of Evidence do not require experts to build their expertise in an academic

or research setting." *Cascadia Wildlands v. Scott Timber Co.*, 618 F. Supp. 3d 1038, 1051 (D.

Or. 2022).  Similarly, the fact that Dr. Moon only recently completed her "on-line Ph.D."

in 2024 and has worked delivery and sales jobs while seeking full-time employment as a

biologist is wholly irrelevant to her qualifications as an expert in this case.  As Plaintiffs

point out, the University of Hawaiʻi at Mānoa—whether online or in-person—holds the

11

highest national research designation available to universities.[1]  And the fact that

Dr. Moon is a recent graduate and has not yet obtained employment in her field says

nothing about her qualifications as an expert.  It can be difficult to obtain work in

academia, and there is nothing wrong with a qualified expert working a "normal" job

while seeking a career in a specialized field.  It would be a surprise indeed to hear one

suggest that a particularly well-known German patent clerk—who received his teaching

certification in physics in 1900, published his special theory of relativity and formula for

mass-energy equivalence ($E = mc^2$) in 1905, and earned his Ph.D. in 1906—would not be

qualified as an expert until 1909, when he finally obtained a professional role in his

chosen field.[2]  Of course, Dr. Moon need not prove she is the next Einstein; the point is

that a qualified expert is a qualified expert, whether or not they tick certain professional

boxes on their résumé.

The County is of course welcome to criticize or call into question the expertise

and qualifications of Dr. Moon and Penniman at trial.  But "[d]isputes as to the strength

of an expert's credentials . . . go to the weight, not the admissibility, of [his or her]

testimony."  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31 (9th Cir. 1998) (cleaned

---

[1]    "UH Mānoa earns highest national research designation," *University of Hawai'i News* (Feb. 20, 2025), http://www.manoa.hawaii.edu/ovprs/uh-manoa-earns-highest-national-research-designation/ [https://perma.cc/2Q7Q-JLVD].

[2]    *See* Maria Violaris, "Einstein at the Patent Office," *Oxford Scientist* (Feb. 7, 2020), http://www.oxsci.org/einstein-at-the-patent-office/ [https://perma.cc/R6K2-T2JU].

up).  On the record before it, the court finds that the education, research, and experience of Dr. Moon and Penniman qualify each of them to testify as experts on seabird biology and light attraction.

## B.  Plaintiffs' Expert Testimony Is Relevant

Under Rule 702, expert testimony is relevant so long as it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *see Daubert*, 509 U.S. at 591.  Put differently, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (cleaned up).  To give proper context to the relevance issue, the court will first summarize the opinions given by Plaintiffs' experts before turning to its analysis.

### 1.  Dr. Moon's Testimony

In her expert report, Dr. Moon offers her "opinions regarding the ongoing light attraction and associated fallout of ESA-listed seabirds caused by [County] streetlights."  Dkt. No. 115-3, at PageID.2074.  Drawing on her "experience, education, and research regarding avian conservation and vision," Dr. Moon concludes in relevant part that "(1) [a]ttraction to bright artificial light at night is a major threat to the survival of ESA-listed seabird species, [and] (2) Maui County streetlights attract and cause fallout of ESA-listed seabirds."  *Id.*

Dr. Moon's first opinion provides the general foundation for her second opinion about County streetlights.  In her report, Dr. Moon explains that "attraction to artificial lights is one of the leading threats" to ESA-listed seabirds, including ʻuaʻu, ʻaʻo, and ʻakēʻakē.  *Id.*  During nighttime migrations between their mountainside colonies and ocean feeding grounds, Hawaiian seabirds can become "attracted to sources of bright artificial light and will circle a light source until they strike an obstacle, land on the ground, or succumb to exhaustion—a phenomenon known as 'fallout.'"  *Id.* at PageID.2074-75.  But petrels and shearwaters like those at issue in this case are "particularly threatened by fallout due to their morphology:  their high wing load combined with legs located further back on their bodies require more elevation and high wind speeds to take flight."  *Id.* at PageID.2075.  As a result, these birds "once grounded . . . are typically unable to take flight again," leaving them vulnerable to predation, vehicle strikes, dehydration, and starvation.  *Id.*  And because ESA-listed Hawaiian seabirds "do not intentionally spend time on land" outside of their breeding colonies, the "only" reason a bird would be recovered from a non-colony location would be as the result of fallout from light attraction or a collision with a power line.  *Id.* These causes are easily distinguished by the nature of a bird's injuries, so it is equally easy to determine the cause of the fallout by assessing the recovered bird.

According to Dr. Moon, fallout caused by streetlights is a "known and clearly identifiable threat to ESA-listed seabirds" which has been "extensively documented on

Kaua'i" by local utility provider KIUC.  *Id.*  And it is also one with which Dr. Moon has

personal experience:  as a biotechnician for KESRP, she "directly observed ['a'o] circling

streetlights, which is typical behavior associated with light attraction," and "recovered

both live and freshly dead seabirds from parking lots, streets, and sidewalks, and found

and relocated seabirds that took shelter under parked cars."  *Id.*  In Dr. Moon's

experience, "the close proximity of streetlights" in those instances "indicated that the

grounded birds were initially attracted by a streetlight, either exclusively or in

conjunction with other nearby artificial lights."  *Id.*

Dr. Moon's second opinion applied a specific methodology to a dataset of fallout

reports to conclude that County streetlights attract and cause fallout of ESA-listed

seabirds.  She reviewed "available seabird recovery databases for Maui County" to

identify all instances in which a bird "directly collided with lights," was "observed

circling and landing under lights," or was "found directly underneath streetlights." *Id.*

at PageID.2080.  Additionally, she included any bird in the dataset that was "recovered

from roadways, intersections, or sidewalks," in light of her understanding that a bird

"recovered from a non-colony location on land near lights was almost certainly

attracted to the light."  *Id.* at PageID.2080-81.

Dr. Moon also included any bird that was "recovered within 250 feet of a

streetlight."  *Id.* at PageID.2080.  This metric represented a "conservative estimate" for

proximity to a streetlight given the ability of seabirds to "react and become attracted to

15

artificial light from much greater distances." *Id.*  To determine whether a bird was recovered within 250 feet of a County streetlight, Dr. Moon first plotted the location data from a .kmz file (provided by Hawaiian Electric) showing the location of County streetlights on Google Earth Pro.  Next, she plotted the location data for every recovered bird represented in the dataset and cross-referenced those locations with the locations of County streetlights to identify birds that were recovered within 250 feet of a County streetlight.  Finally, she confirmed the presence of the streetlight around the time of the recovery using historical imagery from Google Street View.

As Dr. Moon explained in her report and at the hearing, the choice of the 250-foot metric served dual purposes.  It accounted for the tendency of light-attracted seabirds to "land away from the brightly lit area when closing in on the ground, or upon landing uninjured . . . [to] hide in a dark location after landing near streetlights (e.g., underneath cars, in containers, or in doorways)," and was designed to limit instances of fallout attributed to County streetlights to only those where the seabird was recovered "directly underneath" or otherwise so close to a streetlight as to remove any doubt that the County streetlight was a cause.  *Id.* at PageID.2081.  So although (in Dr. Moon's view) a much greater range of fallout incidents could be attributed to County streetlights from a scientific perspective, the 250-foot limitation narrowed the dataset to only those instances which could be (again in Dr. Moon's view) unquestionably linked to a County streetlight.

Dr. Moon also excluded from the dataset any bird that had been "recovered offshore, killed by predators, or found dead in the nest," as well as any bird "for which the data entry lacked location information." *Id.* at PageID.2080-81. This latter category included all birds recovered prior to 2008, for which location data was "insufficient." *Id.* at PageID.2081. After applying these parameters, Dr. Moon generated a dataset consisting of 498 fallout incidents. From that initial number, she further excluded 315 incidents based on insufficiently precise location data, her inability to "confirm the presence of a streetlight within 250 feet" using historical imagery on Google Street View, or the bird's recovery occurring "within 250 feet of a streetlight or light fixture that was not a Maui County streetlight." *Id.* After removing these data points, Dr. Moon was left with 143 ESA-listed seabirds that were recovered "directly underneath" or within 250 feet of a County streetlight, and which in her opinion were therefore "attracted to" a County streetlight. *Id.*

Dr. Moon further elaborated on her conclusions and methodology in her testimony at the April 1 hearing. She explained that fallout typically occurs when juveniles are flying out to sea from their mountainside burrows from the first time, looking down over lit roadways where streetlights are casting "pools of light that are at least as bright as a full moon" and therefore "mimicking an ecologically relevant cue for these birds." Dkt. No. 138, at PageID.2636. For this reason, seabirds "tend to be found directly underneath or near . . . streetlights." *Id.* Accordingly, Dr. Moon fashioned a

methodology that reflected this scientific understanding of seabird behavior, selecting

an intentionally conservative 250-foot distance not only to give the County "every

benefit of the doubt," *id.* at PageID.2641, but also because "at that close distance there

would be no question that the grounded seabird saw the light and would been attracted

to and circling it, even if there were other nearby lights that could have also contributed

to the fallout event."  *Id.* at PageID.2637.

Dr. Moon also explained why she relied upon Google Earth and Street View to

conduct her analysis instead of physically traveling to the locations.  Because her

dataset included fallout events dating back to 2009, "going to the exact location of a

fallout event as much as 17 years later would have told [her] pretty much nothing about

the conditions at the time the bird actually was recovered or even if a streetlight was

present."  *Id.* at PageID.2637.  By contrast, Google Street View allowed Dr. Moon to

view archived images taken around the time of the fallout event to confirm the presence

or absence of a County streetlight.  As for her use of Google Earth, Dr. Moon clarified

that her use of Google Earth was limited to measuring distances between GPS

coordinates; she did not rely on Google Earth's imagery for any aspect of her analysis

(which is not to say she could not have).

Dr. Moon also walked through several examples to demonstrate how she

developed the opinions in her report.  She began with two instances of fallout involving

an 'ua'u that occurred during a two-day period in October 2011.  Both birds fell out

18

near one another in a Wailuku cul-de-sac at the foot of the West Maui mountains.  As

Dr. Moon noted, these fallout events occurred in a "purely residential area" with no

urban, business, or stadium lighting even well beyond a 250-foot radius; aside from the

County streetlights, the "only other light that would be present . . . would be perhaps

some interior glow from residential lights," but as Dr. Moon noted, "there is no

evidence in peer-reviewed literature that the glow from interior residential lights

attracts seabirds."  Id. at PageID.2644-45.  And because there were no other

"ecologically significant" streetlights in the area, see id. at PageID.2734, that left only the

County streetlights as a potential cause of the fallout.  Put differently, the County

streetlights were, in Dr. Moon's opinion, "100 percent" responsible for the fallout.  Id.

Dr. Moon repeated this process using several different examples around Maui,

including one in which a bird was recovered less than 20 feet away from a streetlight—

which, given that streetlights cast light pools roughly 100 feet wide, she considered to

be "directly underneath the streetlight."  Id. at PageID.2647.  She testified that she had

reviewed "[j]ust over two dozen" such fallout events in which there were "no

[ecologically] relevant lights nearby other than Maui County streetlights."  Id. at

PageID.2648; see also id. at PageID.2736.

Dr. Moon also elaborated on certain aspects of seabird biology and behavior

relevant to her methodology and conclusions.  She explained that seabirds have

seabirds have an extra cone in their eyes which gives them better night vision and

19

makes them sensitive to a different part of the light spectrum as compared to humans.

As a result, it is impossible to assess relative brightness in a relevant manner, since the

way humans experience relative brightness is likely far different from the way in which

a seabird experiences it.  But Dr. Moon also testified that even if such a comparison

were possible, it would not affect her conclusions because there is "no evidence that

birds are drawn to the brightest light in an area."  *Id.* at PageID.2669.  And she offered a

separate reason why the presence of other brighter artificial lights in area would not

affect her conclusion that a County streetlight caused a given incident of fallout:  once a

seabird is grounded, it will (if physically able) seek the shelter of darkness.  A grounded

seabird will not, however, move closer to another light source, so one can be reasonably

certain that a bird recovered directly underneath or immediately adjacent to a County

streetlight was grounded by that particular light source.  *See id.* at PageID.2712-13.

Finally, Dr. Moon clarified that fallout can be said to occur in two stages.  First, a

seabird will become distracted or disoriented by artificial light when heading out to or

returning from sea.  Because seabirds can perceive artificial light at distances up to a

kilometer, they likely perceive the "cumulative effects" of artificial light rather than

illumination from any individual light source.  *Id.* at PageID.2725.  But at the second

stage, a distracted seabird will be attracted to or captured by a particular light source,

such as a streetlight, and will proceed to make relatively small circles around that light

until it falls out.  *See id.* at PageID.2725-27.  Dr. Moon testified that her confidence that a

20

particular County streetlight caused a given incident of fallout was based in part on this understanding of seabird behavior and biology.

### 2.     Penniman's Testimony

As Plaintiffs explain in their opposition to the County's *Daubert* motion, "Dr. Moon and Mr. Penniman both applied the same test to identify fallout incidents caused by County streetlights."  Dkt. No. 115, at PageID.2022.  "Mr. Penniman's expert report concurred in Dr. Moon's assessment," and in addition to the 143 fallout incidents identified by Dr. Moon from the 2008-2024 time period, Penniman also identified "another seven fallout incidents from the 2025 fledgling season caused by County streetlights." *Id.*

In his expert report, Penniman elaborated on the basis for his opinion that "[a]ttraction to artificial lights, including Maui County streetlights, injures and kills ESA-listed seabirds."  Dkt. No. 115-15, at PageID.2203.  He noted that both the U.S. Fish and Wildlife Service and Hawaiʻi Division of Forestry and Wildlife have "identified streetlights as a threat to ESA-listed seabirds in Maui County" and on Kauaʻi.  *Id.* at PageID.2204.  He also offered greater detail on how light-related fallout occurs: typically, a seabird "disoriented by artificial lights will engage in aberrant flying patterns, including circling lights at high speeds." *Id.* at PageID.2203.  In Penniman's experience—including his own personal observations of ESA-listed seabirds experiencing fallout—a bird will "circle artificial lights and then crash into the ground,

21

nearby buildings, or light fixtures." *Id.*; *see also* Dkt. No. 138, at PageID.2553-54

(Penniman describing a wedge-tailed shearwater circling a streetlight in Maui before

crashing nearby). When such a bird "hits the ground hard enough," it becomes

"stunned by the impact, and will not move"—a phenomenon Penniman once observed

when an ʻuaʻu "broke its neck on impact due to the speed at which it was moving." *Id.*

But even those seabirds that survive the initial grounding will "most often respond to

fallout by immediately seeking shelter in a small, dark place, such as under a bush or

parked car." *Id.* at PageID.2204. And unless rescued by a human, they will almost

always "die from predation, dehydration, starvation, or other human or predator-

caused harm," because a seabird's morphology—that is, the physical structure and form

of its body and wings—renders it "unable to regain flight without human intervention,

except in the rare situation where a grounded but otherwise uninjured bird lands

somewhere with a natural updraft." *Id.* Even so, "most fallout involves hatch-year

birds," also known as "fledglings," *id.* at PageID.2203, and in Penniman's opinion, it

would be "extremely difficult, if not impossible, for a fledgling to regain flight on its

own," *id.* at PageID.2204, resulting in the bird's mortality or other adverse outcomes.

Finally, Penniman's expert report described the prevailing theories for the

ecological significance of artificial lights in fallout incidents, including the possibilities

that fledglings learning to hunt "confuse artificial lights with . . . prey," that fledglings

used to receiving food from a parent entering an underground burrow "may associate

light, such as seen by a chick looking towards the entrance of the burrow, with a food source," or that "artificial light may be confused with light from natural objects like the moon and stars that ESA-listed seabirds use to navigate out to sea."  *Id.* at PageID.2203.

Penniman also testified separately at the April 1 hearing.  He described the differences between his methodology and Dr. Moon's, which largely turned on his review of incidents from the 2025 fallout season, for which spreadsheet data was unable and for which Penniman relied upon the individual incident reports instead.  For each report, Penniman entered the GPS point corresponding to the location where the bird was recovered into a Google Earth session with the County-streetlight locations overlaid and manually measured the distance from the GPS point to the nearest marked streetlight.  He added that he has consistently employed Google Earth in past research across projects and found it a reliable method of quickly determining the relationship between a fallout incident and an adjacent light source.  He considered it unnecessary to personally visit the fallout sites at nighttime to view the lightscape because he is "familiar with the lights in those areas, and the lights that were closest [in] proximity to those fallout locations were the streetlights."  Dkt. No. 138, at PageID.2606.

Penniman also noted that he had previously presented a paper at a 2023 talk organized by the Pacific Seabird Group, an international organization of seabird biologists, in which he employed a similar methodology to analyze the contribution of artificial light to seabird fallout.  The paper analyzed three years of fallout data to

23

compare the incidence of fallout before and after Maui County high-pressure sodium

streetlights were exchanged for LED lights, attributing fallout to a County streetlight

when a bird was recovered within 1,000 feet (a distance he explained was consistent

with the scientific consensus on the range at which seabirds can be distracted by light,

but not as conservative as the 250-foot metric used by himself and Dr. Moon in their

expert reports).  Penniman noted that he "had discussions with people at Pacific Seabird

Group about that," and that "[a]ll of [his] colleagues there were completely

comfortable" with the methodology.  *Id.* at PageID.2571.

Penniman also offered several examples from his analysis to illustrate his

methodology and conclusions.  He described one fallout event which took place in

central Kahului in which a bird was recovered from a roadway less than 30 feet away

from one County streetlight and 90 feet away from another.  He explained that "because

of the proximity of the lights there and the behavior that birds exhibit when circling

lights," it was "highly likely" that the bird's grounding was due to the streetlights.  *Id.*

at PageID.2586.  This opinion held despite the other artificial lights in urban Kahului

which Penniman acknowledged could have contributed, because "knowing the

behavior, the circling, especially with two lights right in that vicinity," the County

streetlights remained the likely causes.  *Id.*

Penniman additionally discussed a fallout incident that occurred near the War

Memorial Stadium in Kahului.  That incident involved a bird recovered 114 feet away

24

from a County streetlight, which Penniman concluded was responsible for the downing.

Although he had also observed seabirds distracted by and circling stadium lights in the

past, Penniman concluded that in this instance, the lights from the War Memorial

Stadium (if illuminated on the night in question) would not have been responsible for

the grounding.  He explained that the bird was found 1,330 feet away from the nearest

stadium light, and while a seabird would be able to perceive the stadium light at that

distance, it would not have flown such a substantial distance away from the light before

grounding; when a bird circles a light before fallout, "it's circling within the sphere of

that light." *Id.* at PageID.2581.  In his view, although the brighter stadium lights might

have contributed to the bird's distraction, the light that ultimately attracted the bird and

caused it to fall out was the closest artificial light:  the County streetlight.  If instead the

stadium light was the predominant light causing the grounding, Penniman would have

expected the bird to have fallen out "much closer to the stadium lights," not to have

"taken that trip all the way over here." *Id.* at PageID.2583.  Although he conceded that it

would be possible for the bird to do so, he believed it would be unlikely given that

every seabird he has observed circling the War Memorial stadium lights has been

grounded in the lighted stadium area, and never in the darker residential areas where

the County streetlight in question is found.

As Penniman explained, the broader point to be drawn from this example was

that the relative brightness of artificial lights is irrelevant to the question of whether a

25

particular light is responsible for an incident of fallout.  Penniman testified that he

"know[s] of no peer-reviewed literature that refers to the relative brightness" of a light

as a "major contributing factor" for fallout.  *Id.* at PageID.2586.  Brighter artificial lights

in the vicinity of a fallout event might also contribute to a grounding, but for the

incidents for which he concluded a County streetlight was responsible, it was

Penniman's opinion—based on his understanding of seabird vision, circling behavior,

and the proximity of the recovered bird to the light source—that the County streetlight

was nonetheless a significant contributing factor.

### 3.      The Relevance of the Testimony

The County does not distinctly contest the relevance of the opinions of Dr. Moon

and Penniman, and in the court's view, they appear plainly relevant.  All that is

required to establish the relevancy of expert testimony is a showing that it will "help the

trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid.

702(a).  Accordingly, the "relevancy bar is low, demanding only that the evidence

logically advances a material aspect of the proposing party's case."  *Messick*, 747 F.3d at

1196 (cleaned up).  And here, it is clear that the specialized knowledge of Plaintiffs'

experts regarding the causes and mechanics of seabird fallout will help the factfinder to

understand whether County streetlights take ESA-listed seabirds.  Their testimony,

therefore, is relevant.

26

**C.    The Methodology Used by Plaintiffs' Experts Is Reliable and Their Opinions Represent a Reliable Application of Scientific Principles**

As Dr. Moon and Penniman are qualified to provide expert opinions and their testimony would be relevant, the only remaining question is whether it is also sufficiently reliable to admit under Rule 702.  *See Daubert*, 509 U.S. at 588-89.  Expert testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *Primiano*, 598 F.3d at 565 (cleaned up).

To determine whether testimony is reliable, courts may consider "as appropriate" criteria including "(1) testability, (2) publication in peer reviewed literature, (3) known or potential error rate, and (4) general acceptance."  *Cascadia Wildlands*, 618 F. Supp. 3d at 1048 (citing *Daubert*, 509 U.S. at 592-94).  But this list of factors drawn from *Daubert* was "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case."  *Primiano*, 598 F.3d at 564 (cleaned up).  So long as the expert "meets the threshold established by Rule 702," the court should permit the expert to testify, leaving to the fact finder the question of "how much weight to give that testimony."  *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

The County's challenges to the reliability of Plaintiffs' expert testimony fall into three main categories:  (1) the accuracy of the data and/or tools relied upon by Plaintiffs'

experts, (2) the scientific principles undergirding the experts' methodology and the

reliable application of that methodology, and (3) the ability to satisfy the list of factors

discussed in *Daubert*, including testability, acceptance in the scientific community, and

peer review.  The court addresses each category of argument in turn.

### 1.    Accuracy

The County's first category of arguments takes aim at the accuracy of the tools

and data used by Plaintiffs' experts in their reports.  The County first questions the

accuracy of the location data in the database relied upon by Dr. Moon and Penniman,

which it describes as "unverified GPS coordinates" drawn from contemporaneous

incident reports which the database "only purport[s] to summarize."  Dkt. No. 105-1, at

PageID.1902.  In particular, the County takes exception to the fact that "neither expert

has identified a single incident report" for any of the downings attributed to the

County.  *Id.* at PageID.1902-03.  Insofar as the experts' opinions are "based on such

unsubstantiated and undocumented information," the County argues, they must be

excluded.  *Id.* at PageID.1909 (cleaned up).

This error, in the County's view, is compounded by the experts' use of Google

Earth and Street View to conduct their analysis.  Drawing on a 2008 study that analyzed

Google Earth imagery, the County argues that Google Earth has been found to suffer

from substantial "horizontal positioning errors"—in other words, errors in image

alignment between satellite imagery and GPS coordinates—that render any conclusions

drawn from measurements made therein unreliable.  *Id.* at PageID.1910, *see also* Dkt. No. 105-3.  And it similarly takes issue with the experts' use of Google Street View to "verify" that same horizontal positioning and to "rule out any of the other myriad sources of much brighter artificial lights," a methodology it considers "absurd" given "the spatial and temporal limitations" of the lightless virtual environment.  *Id.* at PageID.1911-12.  The County argues that these errors, taken together, have resulted in the experts basing their opinions on facts which "present[] on their face as inaccurate positionally, spatially, and temporally," far below the standard of reliability that *Daubert* requires.  *Id.* at PageID.1913.

At least on the record developed here, these arguments are unpersuasive.  As to the County's argument that Plaintiffs' experts relied on unverified location data without reviewing or substantiating the underlying reports, the County has offered no reason to question the accuracy of the data in the spreadsheet utilized by the experts or in the reports themselves.  Even if the County had provided some good faith basis to doubt the accuracy of that data, expert testimony "should not be excluded simply because the facts upon which [the] opinions are predicated are in dispute, unless those factual assumptions are indisputably wrong."  *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018) (cleaned up).  There is no reason to believe that any of the facts relied upon by Plaintiffs' experts are "indisputably wrong."  And to the extent that the County believes that the experts should have reviewed the underlying reports

instead of relying upon a spreadsheet collating the data from those reports, it has

similarly failed to offer any explanation for why it is improper to rely upon the

spreadsheet alone.  Indeed, Penniman's testimony that the challenged spreadsheet is of

the sort mandated by the Hawaiʻi Division of Forestry and Wildlife and utilized by

MNSRP members suggests that it contains the "kinds of facts or data" upon which

"experts in the particular field would reasonably rely."  Fed. R. Evid. 703.

The County's argument that the experts' use of Google Earth and Street View

renders their opinions unreliable due to the purported inaccuracy of those technologies

is also unpersuasive.  As both experts testified at the hearing, they used Google Earth

for the sole purpose of efficiently measuring the distance between a fallout location and

the nearest streetlight location.  And they made these measurements using Google

Earth's coordinate-plotting functionality.  They did not rely on the satellite image

provided by Google Earth to assist with these measurements.  Had they done so—for

example, had they attempted to measure the distance between a fallout location and a

streetlight by visually identifying the nearest streetlight using the satellite image itself—

the County's argument might carry some weight.  But given that the experts credibly

testified that they did not do so, the County's concerns about the horizontal positioning

accuracy of Google Earth are misplaced.

The County's objection to the experts' use of Google Street View is similarly

misguided.  As Dr. Moon explained, she employed Street View's historical imagery for

the limited purpose of verifying that a County streetlight was indeed present around

the date that a given instance of fallout occurred.  But there is nothing in the record to

suggest that she or Penniman, when preparing their expert reports, used Street View to

establish the precise location of a streetlight for measurement purposes or to evaluate

other potential artificial light sources.  The court therefore sees no reason why concerns

about the temporal, spatial, or lightless nature of Street View would call into question

the accuracy or reliability of the experts' opinions and methods.  Again, the County

remains entitled to challenge the accuracy of the facts or tools used by Plaintiffs' experts

on cross-examination, but those challenges go to weight, not admissibility.

### 2.      Methodological Principles and Application

The County argues that Plaintiffs' experts' opinions are methodologically

unreliable, and its principal contention is that the experts' use of a 250-foot distance

limitation in their methodology is unexplained and at odds with the literature.  It is true

that, according to the experts, peer-reviewed publications indicate that seabirds can be

drawn to artificial light at distances up to 500 meters (1,640 feet) and perhaps as far

away as a kilometer (3,281 feet).  The County argues that there is accordingly "no

scientific basis to claim that a specific streetlight within 250 ft. of a reported grounded

seabird" was the cause of the grounding, and the "chosen distance" of 250 feet is

therefore "arbitrary."  Dkt. No. 119, at PageID.2369-70.  Plaintiffs counter that the "250-

foot test . . . is highly conservative compared to the much greater distances from which

31

artificial lights are known to attract seabirds, [and] so is based on scientifically valid principles."  Dkt. No. 115, at PageID.2033 (cleaned up).

To the extent that causation can be determined by the proximity of a grounded seabird to a County streetlight, the substantially narrower metric used by Plaintiffs' experts is quite clearly scientifically valid (and indeed favors the County) because it has a solid scientific basis for including everything it includes, and merely excludes groundings from its dataset which might also conceivably be attributed to the County. Put differently, although the peer-reviewed literature might support to some degree the conclusion that a downed seabird found up to a kilometer away from a streetlight was grounded by that streetlight, the experts' methodology discounts those examples in favor of only those instances where a streetlight is in such close proximity as to support a high degree of confidence about the likelihood that the light caused the fallout.  There is nothing scientifically suspicious or unreliable about an expert opining that causation exists only when the evidence strongly supports it, while declining to offer an opinion when the evidence exists but is less overwhelming.  We would, indeed, ordinarily think of that as admirable prudence or caution. (Or, perhaps, as cost-saving, since more elaborate forms of inquiry might be necessary to develop an opinion about those closer calls).

The County's argument, however, is a slightly different one.  It is, naturally, not concerned with Plaintiffs' experts' decision to exclude other County streetlights that are

*outside* of the 250-foot limitation.  Instead, it takes issue with the experts' alleged

exclusion of other artificial lights that fall *within* a one-kilometer radius.  In the County's

view, because a seabird can perceive light from "*any* light source" up to a kilometer

away, the 250-foot limitation unscientifically and unfairly excludes other nearby light

sources which may be attracting the bird more substantially than the County's

streetlights.  That is to say, the County challenges the premise—built into the discussion

in the prior paragraph—that it truly is possible to determine causation by the proximity

of a grounded seabird to one of its streetlights.  In the County's view, there are

generally too many artificial light sources within any one-kilometer to allow for a

scientifically valid opinion that any one of those artificial light sources—let alone the

County's streetlights as the one specific source—caused a downing.  At a minimum, the

County says, an expert would need to apply a reliable methodology to address the

existence and relative strength of alternative artificial light sources before offering an

opinion as to causation.

And, in the County's view, Plaintiffs' experts have failed to do so.  The County

offers two arguments in support of this view.  The first—which can be readily

discarded—is the County's contention that the experts' conclusions are inherently

unreliable because neither expert actually visited any fallout location to survey the

lightscape at night.  As the County sees it, this is sufficient to preclude the experts from

reliably engaging with multiple artificial light sources in the vicinity of any downing.

But at the hearing, each expert testified to having a valid scientific reason for not considering it necessary to do so.  Dr. Moon explained that a site visit to observe the lighting conditions would not have provided her with any relevant information since many of the incidents she assessed had occurred a decade or more ago.  And although Penniman reviewed fallout reports from a more recent time period, he testified that he was familiar with the relevant areas and the nighttime lighting conditions therein.  This "combination of experience and personal observation" can be a "sufficient factual ground[] on which to draw conclusions," especially when paired with additional empirical data.  *Waterwatch*, 2025 WL 1067620, at *5 (quoting *Elosu*, 26 F.4th at 1026).

Second—and more substantial—is the county's argument that Dr. Moon and Penniman "simply ignore the contribution of nighttime light emissions from all other sources of artificial light as potential causes of attraction" without offering any scientific or empirical basis from which to conclude that other light sources are irrelevant.  Dkt. No. 105-1, at PageID.1913; *see also id.* at PageID.1916, 1918.  In many ways, this argument is the crux of the County's *Daubert* challenge.  The County contends, in essence, that the experts' methodology and conclusions fail to account for the presence of other artificial lights in the vicinity of a fallout incident.  And because the experts have not offered or applied a reliable methodology to exclude these additional variables, which may be more directly responsible for the fallout, they cannot plausibly isolate a single light source as the likely cause.

34

This argument is well taken as far as it goes; indeed, the court raised a similar question for the parties in advance of the April 1 hearing.  *See* Dkt. No. 128.  But in light of the testimony offered by Plaintiffs' experts at the April 1 hearing, the County's argument does not go far enough.  That is because the experts have sufficiently answered, at least for now, the question of *why* other artificial light sources are not relevant to their analysis and do not affect their conclusions that County streetlights caused the fallout incidents detailed in their reports.

Recall Dr. Moon's explanation of how fallout proceeds in two stages.  At stage one, a seabird traveling to or from its mountainside perch may become distracted by bright artificial light at distances of up to a kilometer away.  At such distances, of course, it is not likely to be the illumination from a single light source that catches the attention of a seabird; instead, it is the cumulative effects of light pollution that draw a seabird off course and towards the artificially lighted area.  This first stage of fallout might be described as the *distraction* phase, where a seabird deviates from its normal biological or ecological behavior in response to the presence of bright artificial light.

If the experts had testified that the fallout process stops there, the County's argument that their failure to engage with the presence of other brighter artificial light sources in the vicinity of a County streetlight might be persuasive.  But the experts' opinions did not stop there.  They testified that after distraction occurs, the fallout process proceeds to its second step, where a distracted seabird becomes attracted to one

35

light in particular and begins circling that light until it collides with a nearby object or crashes to the ground.  This second stage of fallout might be described as the *attraction* phase, where a seabird is drawn to a single light and focuses its attention on that light until it falls out.  Based on the experts' own observations and the peer-reviewed literature, that circling behavior will typically be well-localized to an individual light source, and a bird which falls out after experiencing attraction will tend to be found in the immediate vicinity of that light source.  Given that understanding—and even if other light sources contributed—an expert may conclude with sufficient confidence that an individual streetlight was ultimately responsible for the fallout event.

To better illustrate the point, imagine a hotel guest who has just checked in and is heading upstairs to find her room.  When the elevator doors open on her floor, she sees a sign indicating that her room is somewhere down the hall to the right.  But from her left, the guest can hear live music being played.  Intrigued, she saunters down the hallway to investigate and find that each hotel room has its door propped open to reveal a different musician playing their instrument inside.  If the hotel guest, a tuba enthusiast, walks past a number of rooms before ultimately stopping at the door of a tubist to enjoy the performance, it would be fair to say that the guest was *attracted* to the tubist in particular—even if it might be equally true that she was initially *distracted* by the cacophony as a whole.  In other words, it might not be fair to assign liability for the initial distraction, because it might not be possible to discern who among the revelers

caused the guest to deviate from her normal course.  The deep bass sounds of a tuba, after all, are not necessarily the first thing a person would notice when trumpets and clarinets are also filling the air.  But it would nonetheless be clear who among them ultimately caused the guest to stop what she was doing altogether.

The same dynamics apply here.  Many light sources might have been responsible for distracting the ESA-listed seabirds, either individually or in the aggregate.  But the experts' testimony is that—based on experience, observation, and the scientific literature—the nature of attraction and the factual circumstances of a downing provide enough information to enable an expert to draw the conclusion that a single streetlight was ultimately responsible.  And in light of that understanding, it is not necessary for an expert to assess the relative brightness of other artificial lights in that area.

This argument may or may not prove persuasive for the factfinder at trial.  But the court declines to adopt the County's position that Plaintiffs' experts should be excluded because their methodology does not account for the relative brightness of other artificial lights in the vicinity of a fallout event.  That an expert opinion lacks "relevant consideration of countervailing facts" is an "appropriate consideration[] for cross-examination, and not admissibility."  *City of Seattle v. Monsanto Co.*, No. C16-107, 2023 WL 7046271, at *14 (W.D. Wash. Oct. 26, 2023).  The County may believe that Plaintiffs' expert's opinions are on shaky ground, but "[s]haky but admissible evidence

is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

The County offers a final variation of its theme. It contends that Plaintiffs' experts could not have reliably applied their methodology because other prominent studies—including the KIUC Habitat Conservation Plan, which both experts cite in their reports—have concluded that it is impossible to narrow the cause of a light-induced fallout incident to a particular streetlight. In the County's view, the KIUC report is "the only known actual study of streetlights as an alleged proximate cause of seabird groundings" relied upon by Plaintiffs' experts. Dkt. No. 105-1, at PageID.1901. And according to the County, the KIUC report's conclusions "flatly contradict" the experts' opinions: it observes that "data [is] insufficient, that isolating streetlights as a cause of fallout was prohibited by surrounding urban lights, that specific testing involving manipulation of light sources at night were necessary, and that data on the detectability of seabirds as grounded under streetlights *does not exist*." *Id.* at 1915 & n.10 (original emphasis).

There is reason to question the County's characterization, given the testimony of Plaintiffs' experts that the KIUC report's conclusions are specific to the distinct factual circumstances on Kaua'i and are not representative of a broader scientific consensus. For example, the experts explained at the hearing that when seabirds fall out on Kaua'i, they are "collected by the public and put into drop boxes . . . away from where they

38

were picked up," whereas on Maui, "an actual point source of where that bird came down" is recorded.  Dkt. No. 138, at PageID.2589.  In other words, what is true on Kaua'i may or may not be true on Maui; that is a question for the factfinder to decide.  But "the existence of a report with conclusions contrary to those of [an] expert witness does not suffice to hold the witness's testimony unreliable."  *Francis v. Maersk Lines, Ltd.*, No. C03-2898, 2005 WL 6764504, at \*2 (W.D. Wash. Dec. 8, 2005) (citing *Kennedy*, 161 F.3d at 1230-31).  The KIUC plan does not provide any basis for the court to conclude that Plaintiffs' expert's methodology or conclusions are inherently unreliable.

### 3.    The *Daubert* Factors

The County's remaining arguments challenge the reliability of Plaintiffs' experts' opinions based on a variety of factors, including the inability of their study to be reproduced by a third-party, the absence of support for their theory or methodology in any peer-reviewed source, and the lack of acceptance in the scientific community.  These arguments appear to track the non-exhaustive list of factors detailed by the Supreme Court in *Daubert*:  "(1) testability, (2) publication in peer reviewed literature, (3) known or potential error rate, and (4) general acceptance."  *Cascadia Wildlands*, 618 F. Supp. 3d at 1048 (citing *Daubert*, 509 U.S. at 592-94).  But as noted, these factors "neither necessarily nor exclusively appl[y] to all experts or . . . every case," and the court has broad discretion to determine how to assess reliability in the specific context of the case before it.  *Kumho Tire*, 526 U.S. at 141-42, 150.

Some of these arguments are easily disposed of.  For instance, the County's argument that the experts' methodology cannot be "tested [or] reproduced" is belied generally by the experts' testimony about how their analysis could be replicated, *see, e.g.*, Dkt. No. 138, at PageID.2643-44, and specifically by Penniman's testimony that defense counsel at one point did in fact replicate the methodology during a deposition, *id.* at PageID.2624-25.  Others are more substantial, including the County's argument that neither expert's theory or methodology "has ever been proposed or is even known in the scientific community," and that Plaintiffs have furnished no evidence to establish "general acceptance or peer review and publication" or validation in "any objective academic or professional source."  Dkt. No. 105-1, at PageID.1914-15.

Plaintiffs rejoin that "both Dr. Moon and Mr. Penniman firmly grounded their opinions in the peer-reviewed scientific research regarding fallout of seabirds . . . due to light attraction."  Dkt. No. 115, at PageID.2031.  The court agrees.  Although the precise methodology employed by Dr. Moon and Penniman may not have been peer-reviewed or published, it is clear from the experts' reports and their testimony at the hearing that their opinions are built upon a solid scientific foundation based on peer-reviewed, published, and widely accepted scientific principles and conclusions.  The fact that their opinions have not been subject to peer review does not justify their exclusion; as the Ninth Circuit has noted, "[p]eer reviewed scientific literature may be unavailable" for any number of reasons, and "an opinion unsupported by peer-reviewed publication"

may nonetheless be admissible if it has other sufficient indicia of reliability. *Primiano*, 598 F.3d at 565, 567. Plaintiffs have demonstrated that there are sufficient indicia of reliability here.

Bolstering this conclusion is Plaintiffs' observation that their methodology is not, in fact, unknown or unaccepted. Penniman testified that he has not only utilized a similar methodology in the past, but also that when he presented a paper using that methodology at a talk hosted by an international organization of seabird experts, no other expert challenged or otherwise questioned his methods or conclusions. This suggests that the experts' theory and methodology is, at least to some degree, known and accepted in the scientific community. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 & n.11 (9th Cir. 1995); *cf.* Fed. R. Evid. 703.

*     *     *

For the foregoing reasons, the court concludes that the opinions of Dr. Moon and Penniman are both relevant and reliable and finds no reason to exclude them. Accordingly, the County's Motion to Exclude the testimonies of Dr. Moon and Penniman is DENIED.

**D.      The County's Experts Are Qualified and Their Opinions Appear Reliable and at Least Minimally Relevant and Are Therefore Generally Admissible**

Plaintiffs have filed their own motion seeking to exclude the testimony of the County's proposed experts, John W. Curran, Ph.D., and Thomas R. Glesne. Both

41

individuals are qualified as experts in their field.  Dr. Curran holds a Ph.D. in physics

from Drexel University, has given numerous lectures on lighting, and has served in

technical roles for lighting companies for over twenty years.  Dkt. No. 89-13, at

PageID.1336-38.  He has "decades of experience managing engineering departments

involved in the design, development and production of sensing, signaling and lighting

products."  *Id.* at PageID.1289.  Glesne has a degree in physics from Guilford College,

has published and presented at various conferences largely in the fields of optics and

lasers, and has served in high level roles for entities including NASA, Boeing, and

Raytheon.  Dkt. No. 89-12, at PageID.1284-87.  For the past ten years, he has served as a

lighting consultant for a "leading LED lighting solutions company."  *Id.* at PageID.1284.

Plaintiffs do not appear to challenge the qualifications of these experts, and in the

court's view, each expert is plainly qualified in his respective field.

Both Dr. Curran and Glesne's opinions are set forth in the form of responses to

questions provided by the County's counsel.  Dr. Curran's report provides, in the

County's words, a "survey and review of the typical categories, makes, model, types,

and uses of artificial lights which make up . . . other sources of artificial light . . . [that]

constitute[] the relative brightness within the surrounding urban lightscape."  Dkt. No.

116, at PageID.2256 (internal quotation marks omitted).  Specifically, Dr. Curran's report

provides (i) "the types and categories of artificial lights and fixtures that contribute to

nighttime illumination"; (ii) the "mechanical and operational characteristics" of these

42

lights, including "light distribution, direction, intensity, [and] energy output" compared to streetlight fixtures; (iii) an explanation of the differences between "how illumination from streetlight fixtures cast light and reflection as a contribution to skyglow and brightness as compared to other types of lighting fixtures," as well as a discussion of "the differences in the intent and purpose" of the same; (iv) an opinion as to "whether any light from existing [County] streetlight fixtures . . . is a direct source of illumination and contribution to skyglow; and (v) an opinion as to whether it can be "said within a reasonable scientific probability at what level or height a seabird would have to be flying before it would be able to directly see the source of illumination coming from an existing [County] streetlight" on Maui.  Dkt. No. 89-13, at PageID.1289-1325.  As part of this review, Dr. Curran's team "visited a number of sites in Maui to capture what [artificial] lighting actually looks like" and included photographs from the site visits in his report.  *Id.* at PageID.1311.

Glesne's expert report provides his opinions on the contribution of County streetlights to overall skyglow in and around Maui.  To develop these opinions, Glesne took spectrometer measurements of individual streetlights and drew conclusions from those measurements based on "published scientific literature and [his] own expertise in outdoor lighting, spectral measurements, physics-based modeling and satellite sensor development."  Dkt. No. 89-12, at PageID.1264.  More specifically, Glesne's report explains what skyglow is, how it is measured, and the "percentage contribution to

overall skyglow" from County streetlights. *Id.* at PageID.1264-71. Additionally, his

report contains opinions about the relative contribution of County streetlights as

compared to "other sources of combined artificial light [and] . . . spectral blue light

content," the differences between how streetlights illuminate the surrounding area as

compared to other types of lights, the different ways in which "light is cast and

transmitted into the atmosphere," whether there are "observable differences in how

roadway lighting systems are planned, designed, organized, and controlled in the

human environment as compared to the planning, design, and organization of other

types of lighting" that contribute to skyglow, and what the result of "turning off all

existing [County] streetlights" would be on skyglow and spectral blue light content. *Id.*

at PageID.1271-80.

Although Plaintiffs take issue with various aspects of each expert's methodology

and conclusions, they do not (save for the limited exceptions discussed in greater detail

below) appear to challenge the reliability or factual basis for the expert opinions.

Except as detailed below, the court likewise finds no defect in the reliability of

Dr. Curran and Glesne's opinions.

Plaintiffs' arguments for exclusion, then, are primarily directed at the relevance

of the proposed expert opinions. They object that testimony "regarding the existence of

other light sources" is not relevant to the issue of whether County streetlights take

endangered seabirds. Dkt. No. 104-1, at PageID.1710. And they offer multiple

44

explanations for why such testimony is not relevant:  because the apparent brightness of

lighting, as perceived by human eyes, says nothing about how a seabird perceives it;

because multiple lights can contribute to distraction and disorientation of seabirds, and

therefore "[w]hether other artificial lights on Maui also cause take is irrelevant to

whether Maui County streetlights do," *id.* at PageID.1711; and because "[t]here is no

scientific basis for claiming that skyglow has anything to do with the attraction of ESA-

listed seabirds to artificial lights," *id.* at PageID.1714.

Any of these arguments may ultimately prove persuasive, but they offer no

reason to exclude the experts at this juncture.  As the court noted before the *Daubert*

hearing, "the question of whether [the County's experts] should be allowed to testify is

principally one of relevance."  Dkt. No. 128.  And when, as here, the trial will be a bench

trial, the court is well-positioned to make a relevancy determination in light of the

evidence developed at trial.  *See Waterwatch*, 2025 WL 1067620, at *3 (observing that "in

a bench trial, concerns about the reliability of these opinions are better addressed

through cross-examination and the presentation of contrary evidence than through

exclusion").  If the opinion proves minimally relevant, the court can achieve essentially

the same result as exclusion by assigning the testimony little or no weight.  *Id.* at *2

("[W]here the factfinder and the gatekeeper are the same, the court does not err in

admitting the evidence subject to the ability later to exclude it or disregard it if it turns

45

out not to meet the standard of reliability established by Rule 702." (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

There is also a substantive reason to permit the County's expert testimony. Plaintiffs' position is that there are at least 143 instances in which the evidence that a County streetlight was responsible for the downing is so strong that the presence of other artificial lights is functionally irrelevant. But as Plaintiffs and their experts acknowledge, other artificial lights can also contribute to seabird fallout, and the County is entitled to rebut Plaintiffs' causation argument by introducing testimony about the surrounding lightscape. The County's experts may therefore offer their opinions about other artificial lights on Maui to provide additional context about the urban lighting conditions in which fallout occurs, and to establish facts and variables for Plaintiffs' experts to reckon with.

A similar conclusion applies to Plaintiffs' arguments about the relative brightness of artificial lights. To be sure, Defendants have laid no foundation to offer expert testimony about the relationship between relative brightness and seabird fallout. But it is also true that Plaintiffs have not conclusively established that relative brightness is totally irrelevant to fallout as a matter of fact. In other words, there is a difference between a lack of scientific support for a proposition and a scientific consensus that the proposition is wrong. Here, Plaintiffs' experts' testimony suggests that the former, but not the latter, is true. Indeed, Plaintiffs' own argument would seem to allow for at least

46

the *possibility* that in certain circumstances, a brighter light might be more "ecologically relevant" than a County streetlight.  *See, e.g.,* Dkt. No. 120, at PageID.2387 ("[S]eabirds are attracted to ecologically relevant light sources and not necessarily the 'brightest' lights in a given area.").  And especially given the admonition of Plaintiffs' experts that seabird vision is not so well understood as to permit an opinion as to exactly what or how a seabird sees, it would seem imprudent to exclude testimony at this juncture that at least *could* be relevant to seabird fallout—or that, at the least, the court could conceivably find that Plaintiffs' experts have not adequately or persuasively engaged with.  The County's experts will therefore be permitted to offer testimony about the urban lightscape of Maui and the relative brightness of artificial lights.  Plaintiffs' experts will in turn be permitted to opine as to why those facts should be discounted or disregarded.  This question, again, is one of weight—not of admissibility.

This conclusion, however, is subject to several important caveats.  As Plaintiffs point out, neither Dr. Curran nor Glesne has a background in seabird biology.  That offers no reason to exclude their testimony altogether; for the reasons discussed above, they are competent to testify to the relevant issue of artificial lighting on Maui.  But an expert's testimony must stay "within the reasonable confines of his subject area."  *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112-13 (N.D. Cal. 2018).  It follows that the County's experts' lack of expertise in seabird biology *does* require their testimony to be constrained to reflect the limits of their expertise.  In other words, while they may

give testimony to help develop a complete picture of the Maui lightscape, they may not

opine on how lighting relates to seabird fallout or seabird behavior.  In particular,

Dr. Curran's proffered opinion about "what level or height would a seabird have to be

flying before it would be able to directly see the source of illumination coming from an

existing streetlight operated on behalf of Maui County on Maui Island," Dkt. No. 89-13,

at PageID.1323, is outside the scope of his expertise and will be excluded.  Although

that opinion may also be based on the otherwise reliable principles undergirding his

other conclusions, "scientific validity for one purpose is not necessarily scientific

validity for other, unrelated purposes."  *Cascadia Wildlands*, 618 F. Supp. 3d at 1048 n.1

(citing *Daubert*, 509 U.S. at 591).  Dr. Curran is not an expert on seabird behavior or

vision and his knowledgeability about lighting does not provide a basis for him to

testify about where a seabird would need to be flying in order to perceive light.

Dr. Curran's testimony about roadway lighting safety will also be excluded.

There are multiple reasons to exclude this testimony.  First, Dr. Curran himself has

suggested that he does not have the necessary credentials to testify as an expert about

roadway lighting safety.  *See* Dkt. No. 104-14, at PageID.1842-44; *cf. Sullivan v. Loden*,

Civil No. 21-00123, 2024 WL 4370839, at *3 (D. Haw. Oct. 2, 2024) (excluding an expert

in part based on his own concession that his experience did not qualify him as an

expert); *see also Fontana v. City of Fed. Way*, No. C11-998, 2014 WL 202104, at *6 (W.D.

Wash. Jan. 17, 2014) ("An expert in one field cannot express an opinion relying on data

that requires expertise in another field."). Second—and more importantly—testimony about roadway lighting safety standards is simply not relevant to the issue of whether County lights take seabirds. Whether current County lighting practices are safe, or whether mitigation measures would affect the safety of County roadways, are matters not germane to the causation question at issue in this case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (cleaned up).

Dr. Curran may of course testify about the facts that form the basis of any admissible opinion, and if he relied upon roadway lighting safety standards in that regard, he may explain as much, subject to cross-examination by Plaintiffs. *See Waterwatch*, 2025 WL 1067620, at *4. But he may not offer an opinion on roadway lighting safety standards outright; a party may not bootstrap policy concerns into the ESA analysis through expert testimony. *See, e.g., Wishtoyo Found. v. United Water Conserv. Dist.*, No. CV 16-3869, 2017 WL 8292770, at *3 (C.D. Cal. Sept. 8, 2017) (excluding expert testimony about "adverse effects to the public" that would occur if Defendants altered their practices because it "would not go to Defendant's liability under the ESA").

Accordingly, Dr. Curran will not be permitted to testify as to roadway lighting safety standards. And neither Dr. Curran nor Glesne will be permitted to give any opinion as to the relationship between artificial lighting and seabird biology or

49

behavior—including, in Dr. Curran's case, through testimony about the "level or height . . . a seabird [would] have to be flying before it would be able to directly see the source of illumination" from a County streetlight. Apart from these limitations, however, Dr. Curran and Glesne will be permitted to testify as experts regarding artificial lighting on Maui. To that extent, then, Plaintiffs' Motion to Exclude Testimonies of John W. Curran, Ph.D. and Thomas R. Glesne is GRANTED IN PART and DENIED IN PART.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Exclude Testimonies of John W. Curran, Ph.D. and Thomas R. Glesne is GRANTED IN PART and DENIED IN PART. Defendant County of Maui's Motion to Exclude Causation Testimony of Hannah Moon, Ph.D. and Jay Penniman is DENIED.

IT IS SO ORDERED.

DATED: April 24, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

_____

Micah W.J. Smith
United States District Judge

Civil No. 24-00494 MWJS-WRP, *Conservation Council for Hawaii v. Hawaiian Electric Company, Inc.*, et al.; ORDER DENYING DEFENDANT COUNTY OF MAUI'S MOTION TO EXCLUDE CAUSATION TESTIMONY OF HANNAH MOON, PH.D. AND JAY PENNIMAN, AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE TESTIMONIES OF JOHN W. CURRAN, PH.D. AND THOMAS R. GLESNE